[824 NE2d 898, 791 NYS2d 458]

GEORGE E. PATAKI, as Governor of the State of New York, Respondent, v NEW YORK STATE ASSEMBLY et al., Appellants.

SHELDON SILVER, as Member and Speaker of the New York State Assembly, et al., Appellants, v GEORGE E. PATAKI, as Governor of the State of New York, Respondent.

Argued November 16, 2004; decided December 16, 2004

### POINTS OF COUNSEL

*Hancock & Estabrook, LLP,* Syracuse (*Stewart F. Hancock, Jr., Alan J. Pierce* and *Sonya G. Bonneau* of counsel), for New York State Senate, appellant in the first above-entitled action. I. The Appellate Division holding that the Governor may incorporate amendments to existing laws, programmatic policy measures and other general legislative matters in his proposed New York Constitution, article VII, § 3 "appropriation" bills and then by invoking New York Constitution, article VII, § 4 prohibit the Legislature from striking out or altering these unconstitutionally included provisions ignores the plain meaning and destroys the intended structure and scheme of article VII. (*Silver v Pataki,* 179 Misc 2d 315, 274 AD2d 57, 96 NY2d 532; *People v Tremaine,* 281 NY 1; *Cohen v State of New York,* 94 NY2d 1; *People v Tremaine,* 252 NY 27; *Matter of Village of Chestnut Ridge v Howard,* 92 NY2d 718; *Quotron Sys. v Gallman,* 39 NY2d 428; *Winner v Cuomo,* 176 AD2d 60; *Saxton v Carey,* 44 NY2d 545; *Matter of King v Cuomo,* 81 NY2d 247; *Settle v Van Evrea,* 49 NY 280.) II. *Saxton v Carey* (44 NY2d 545 [1978]) does not support the distorted application of New York Constitution, article VII, §§ 2, 3 and 4 urged by the Governor and adopted by the Appellate Division majority. (*People v Tremaine,* 252 NY 27; *People v Tremaine,* 281 NY 1; *New York State Bankers Assn. v Wetzler,* 81 NY2d 98; *Hidley v Rockefeller,* 28 NY2d 439.) III. There is no basis for the Governor's contention that the Legislature's general legislative powers under New York Constitution article III to enact single-purpose bills and nonappropriation bills are limited by the "no-alteration" restriction of New York Constitution, article VII, § 4. (*People v Tremaine,* 281 NY 1; *People ex rel. Burby v Howland,* 155 NY 270.) IV. The "relates specifically to" language in the "anti-rider" provision in New York Constitution, article VII, § 6 is not the criterion for what the Governor may permissibly include in his appropriation bills. (*Silver v Pataki,* 192 Misc 2d 117; *People v Tremaine,* 252 NY 27; *Schuyler v South Mall Constructors,* 32 AD2d 454; *Rice v Perales,* 156 Misc 2d 631, 193 AD2d 1135.) V. The Legislature's single-purpose appropriation bills were properly enacted in full compliance with New York Constitution, article VII, § 5.

*Weil, Gotshal & Manges LLP,* New York City (*Steven Alan Reiss, Gregory S. Coleman, Janet L. Horn* and *Gregg J. Costa* of

counsel), for New York State Assembly, appellant in the first above-entitled action. I. The Governor's unprecedented attempt to sue the Legislature challenging the constitutionality of bills he signed into law is not justiciable. (*Silver v Pataki,* 96 NY2d 532; *Raines v Byrd,* 521 US 811; *Society of Plastics Indus. v County of Suffolk,* 77 NY2d 761; *Chenoweth v Clinton,* 181 F3d 112; *Matter of Posner v Rockefeller,* 26 NY2d 970; *Moore v U.S. House of Representatives,* 733 F2d 946; *Schlesinger v Reservists Comm. to Stop the War,* 418 US 208; *Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801; *People v Tremaine,* 252 NY 27; *People v Tremaine,* 281 NY 1.) II. The Legislature constitutionally responded to the Governor's unprecedented attempt to enact substantive policy provisions in appropriation bills. (*Silver v Pataki,* 96 NY2d 532; *Matter of Thirty-Fourth St. R.R. Co.,* 102 NY 343; *Matter of County of Oneida v Berle,* 49 NY2d 515; *Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801; *People v Tremaine,* 252 NY 27; *Saxton v Carey,* 44 NY2d 545; *People v Tremaine,* 281 NY 1; *Hidley v Rockefeller,* 28 NY2d 439; *New York State Bankers Assn. v Wetzler,* 81 NY2d 98; *Winner v Cuomo,* 176 AD2d 60.)

*Stillman & Friedman, P.C.,* New York City (*Paul Shechtman* and *Nathaniel Z. Marmur* of counsel), for respondent in the first above-entitled action. I. The Legislature unconstitutionally altered the Governor's appropriation bills in violation of New York Constitution, article VII, § 4. (*People v Tremaine,* 281 NY 1; *People v Tremaine,* 252 NY 27; *New York State Bankers Assn. v Wetzler,* 81 NY2d 98; *Matter of Knight-Ridder Broadcasting v Greenberg,* 70 NY2d 151; *Baker v Carr,* 369 US 186; *Matter of Abrams v New York City Tr. Auth.,* 39 NY2d 990; *Saxton v Carey,* 44 NY2d 545; *Hidley v Rockefeller,* 28 NY2d 439; *Silver v Pataki,* 3 AD3d 101; *Leader v Maroney, Ponzini & Spencer,* 97 NY2d 95.) II. The Governor's claims are justiciable. (*Silver v Pataki,* 96 NY2d 532; *Saxton v Carey,* 44 NY2d 545; *New York State Assn. of Nurse Anesthetists v Novello,* 2 NY3d 207; *Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801; *Society of Plastics Indus. v County of Suffolk,* 77 NY2d 761; *Winner v Cuomo,* 176 AD2d 60; *People v Tremaine,* 257 App Div 117, 281 NY 1; *Kansas v United States,* 24 F Supp 2d 1192, 214 F3d 1196; *Matter of Urbach v Farrell,* 229 AD2d 275; *Matter of Rivera v Espada,* 98 NY2d 422.)

*Weil, Gotshal & Manges LLP,* New York City (*Steven Alan Reiss, Gregory S. Coleman, Janet L. Horn, Kristyn Noeth, Hope L. Karp* and *Gregg J. Costa* of counsel), for Sheldon Silver, appel-

lant in the second above-entitled action. I. The Governor's line-item veto of 55 provisions that were neither "items of appropriation of money" nor even contained in appropriation bills was unconstitutional. (*Anderson v Regan,* 53 NY2d 356; *Matter of County of Oneida v Berle,* 49 NY2d 515; *Matter of King v Cuomo,* 81 NY2d 247; *Matter of Thirty-Fourth St. R.R. Co.,* 102 NY 343; *Clinton v City of New York,* 524 US 417; *People v Tremaine,* 281 NY 1; *Bengzon v Secretary of Justice of Philippine Is.,* 299 US 410.) II. The Governor's affirmative defense that he possessed roving authority to line-item veto the 55 provisions because those provisions were unconstitutional is meritless. (*Matter of Thirty-Fourth St. R.R. Co.,* 102 NY 343; *Anderson v Regan,* 53 NY2d 346; *Matter of Picone v Commissioner of Licenses of City of N.Y.,* 241 NY 157; *Saratoga County Chamber of Commerce,* 100 NY2d 801; *People v Tremaine,* 252 NY 27; *People v Tremaine,* 281 NY 1; *New York State Bankers Assn. v Wetzler,* 81 NY2d 98; *Saxton v Carey,* 44 NY2d 545; *Matter of King v Cuomo,* 81 NY2d 247; *Matter of County of Oneida v Berle,* 49 NY2d 515.)

*Hancock & Estabrook, LLP,* Syracuse (*Stewart F. Hancock, Jr., Alan J. Pierce* and *Sonya G. Bonneau* of counsel), for New York State Senate, appellant in the second above-entitled action. I. "Non-appropriation bills" are not appropriation bills and cannot be treated as such for the purpose of applying the restrictions on legislative alterations imposed by New York Constitution, article VII, § 4. (*New York State Bankers Assn. v Wetzler,* 81 NY2d 98; *Saxton v Carey,* 44 NY2d 545; *Hidley v Rockefeller,* 28 NY2d 439; *People v Tremaine,* 252 NY 27; *People v Tremaine,* 281 NY 1; *Cohen v State of New York,* 94 NY2d 1; *Quotron Sys. v Gallman,* 39 NY2d 428; *Winner v Cuomo,* 176 AD2d 60; *Pataki v New York State Assembly,* 190 Misc 2d 716; *People ex rel. Burby v Howland,* 155 NY 270.) II. The decisions below grant the Governor unparalleled power to selectively "veto" disfavored legislative enactments on constitutional grounds and, thus, constitute an outright violation of fundamental separation of powers doctrine and a repudiation of the clearly expressed intent of the framers of the executive budget amendment. (*People ex rel. Simon v Bradley,* 207 NY 592; *Marbury v Madison,* 1 Cranch [5 US] 137; *Cohen v State of New York,* 94 NY2d 1; *Matter of County of Oneida v Berle,* 49 NY2d 515; *Saratoga County Chamber of Commerce v Pataki,* 100 NY2d 801.) III. Even adopting for the sake of argument the Governor's proposition that nonappropriation bills may be treated as appropriation bills for the purpose of enforcing the New York Constitution, article VII, § 4 "no alteration" restriction, his reliance on the "relates

specifically to" language in the "anti-rider" provision in New York Constitution, article VII, § 6 as the criterion for what he could have permissibly included in his purported appropriation bills is without basis. (*People v Tremaine,* 252 NY 27; *Schuyler v South Mall Constructors,* 32 AD2d 454; *Matter of Wendell v Lavin,* 246 NY 115; *Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeals,* 97 NY2d 86; *Matter of Dutchess County Dept. of Social Servs. [Day] v Day,* 96 NY2d 149; *Mangam v City of Brooklyn,* 98 NY 585; *Matter of Tonis v Board of Regents,* 295 NY 286; *Matter of Albano v Kirby,* 36 NY2d 526.) IV. Neither *Saxton v Carey* (44 NY2d 545 [1978]) nor any other controlling authority provides any support for the Governor's contorted construction of New York Constitution, article VII, §§ 2, 3 and 4. (*People v Tremaine,* 281 NY 1; *New York State Bankers Assn. v Wetzler,* 81 NY2d 98; *Hidley v Rockefeller,* 28 NY2d 439; *Schuyler v South Mall Constructors,* 32 AD2d 454; *Rice v Perales,* 156 Misc 2d 631.) V. The Governor's purported exercise of a "line-item veto" over the Legislature's amendments to his non-appropriation bills was unconstitutional under New York Constitution, article IV, § 7.

*Cravath, Swaine & Moore LLP,* New York City (*Max R. Shulman* of counsel), for respondent in the second above-entitled action. I. The courts below correctly held that the Legislature's alterations to the Governor's items of appropriation were unconstitutional and therefore void ab initio. (*Wein v State of New York,* 39 NY2d 136; *People ex rel. Burby v Howland,* 155 NY 270; *Saxton v Carey,* 44 NY2d 545; *Schuyler v South Mall Constructors,* 32 AD2d 454; *Rice v Perales,* 156 Misc 2d 631, 193 AD2d 1135; *Matter of King v Cuomo,* 81 NY2d 247; *People v Carroll,* 3 NY2d 686; *Ivey v State of New York,* 80 NY2d 474; *Matter of Fay,* 291 NY 198; *People v Tremaine,* 281 NY 1.) II. The courts below correctly declined to decide the constitutionality of the Governor's line-item vetoes. (*Matter of Peters v New York City Hous. Auth.,* 307 NY 519; *T.D. v New York State Off. of Mental Health,* 91 NY2d 860.) III. The Governor's line-item vetoes were constitutional. (*People v Tremaine,* 252 NY 27; *Bengzon v Secretary of Justice of Philippine Is.,* 299 US 410.)

## OPINION OF THE COURT

R.S. Smith, J.

Since 1927, the New York Constitution has provided for executive budgeting. Under this system, the State's budget originates with the Governor, and he must submit to the Legislature

proposed legislation, including "appropriation bills," to put his proposed budget into effect. The Legislature "may not alter an appropriation bill submitted by the governor except to strike out or reduce items therein" (NY Const, art VII, § 4).

In these cases, the Governor and the Legislature accuse each other of overstepping limitations placed by the Constitution on their roles in enacting the budget. We resolve the dispute in the Governor's favor. We hold, in both of these cases, that the Legislature altered the Governor's appropriation bills in ways not permitted by the Constitution. In *Pataki v New York State Assembly*, we also hold that the Governor did not exceed constitutional limits on what his appropriation bills may contain.

Five members of this Court agree with these two conclusions, and with the reasoning that leads to the first of them. As to our second conclusion, two members of the majority have reservations about the analysis in the section of this opinion entitled "The Content of Appropriation Bills" (at 92-99), as explained in Judge Rosenblatt's concurring opinion.

## I. Background: New York's Executive Budget System

Until 1927, all budget legislation, like other legislation, originated with the Legislature. The Governor's only power over budget legislation was the veto. He could veto any bill passed by the Legislature, and if any such bill contained "several items of appropriation" he could veto one or more of those items while approving the remainder of the bill (1894 NY Const, art IV, § 9). The Legislature, if in session, could pass a bill or item of appropriation over the Governor's veto by a two-thirds vote (*id.*).

In 1915, executive budgeting was proposed as a way to reform the planning and management of the State's finances. A report submitted by a committee to that year's Constitutional Convention argued that the Legislature was not the right body to prepare a budget. The Legislature, the report said, did not administer government departments, and therefore lacked both the knowledge about and the authority over those departments that was necessary to design a budget properly. Legislators were accountable to voters in their own districts, rather than to the State as a whole, and thus would prepare a budget by "compromise or bargain"—a process which "has become so common . . . as to be stigmatized by the terms 'log rolling' and 'pork barrel' " (Report of Comm on State Finances, Revenues and

Expenditures, Relative to a Budget System for the State, State of New York in Convention Doc No. 32, at 8 [Aug. 4, 1915]). The committee chairman, Henry L. Stimson, said that legislative budgeting produced "extravagance, waste and irresponsibility" (Stimson, *Saving the State's Money: The sound and far-reaching financial reforms contained in the proposed Constitution*, Albany: Committee for the Adoption of the Constitution, 1915, No. 12, at 8). The solution, in Stimson's view, was to make the Governor accountable for the budget by giving him, not the Legislature, the duty to originate it. He explained:

> "We cannot expect economy in the future unless some one man will have to lie awake nights to accomplish it. The only way to stop waste is for the people of the State to know exactly whose fault it is if waste occurs, or if the cost of government steadily rises without compensating increase in service rendered.
>
> "So the proposed Constitution provides that the estimates of all administrative departments shall be first submitted to the Governor, and shall be revised by him. The responsibility for securing an economical and systematic plan for the annual budget of the State is thus laid squarely on his shoulders." (*Id.*)

Stimson's 1915 proposal contained a provision saying: "The Legislature may not alter an appropriation bill submitted by the Governor except to strike out or reduce items therein." (1 Unrevised Rec, 1915 NY Constitutional Convention, at 1135.) This limitation, Stimson argued, was essential to the preservation of an executive budget system. The proposal, he explained:

> "provides that when the Governor introduces his budget that budget must be disposed of without addition. The Legislature can cut down, the Legislature can strike out but they must approach it from the standpoint of a critic and not from the standpoint of a rival constructor. The budget must be protected against its being wholly superseded by a new legislative budget and a resort to the same situation that we have now. Otherwise you would have nothing." (2 Unrevised Rec, 1915 NY Constitutional Convention, at 1586.)

Thus the original purpose of the executive budgeting system was to change the roles of the Governor and the Legislature in

the process—to make the Governor the "constructor" and the Legislature the "critic." As the dissent stresses, the newly-proposed system did not "deprive the Legislature of any of its prerogatives"; nor did it, in a fundamental way, "add to the Governor's power" (dissenting op at 107). It remained true, before and after executive budgeting was adopted, that no budget could pass without the Legislature's assent. In that sense, we agree with the dissent that the new system Stimson proposed did not "transfer significant lawmaking *authority* from the Legislature to the Executive" (*id.* [emphasis added]). It certainly did, however, transfer the role of "constructor" from the Legislature to the Governor. That was the whole point.

A proposed Constitution containing the executive budget provisions that Stimson favored was rejected by the voters in 1915. But efforts to reform budgeting continued, eventually with the support of Governor Alfred E. Smith. In 1926, the voters approved constitutional amendments similar to the 1915 executive budget proposals. These provisions took effect in 1927, and were carried forward with little change in the 1938 Constitution that is in force today.

Article VII, §§ 1-7 now govern the budget process. Several of these sections vest certain legislative powers in the Governor, creating a limited exception to the rule stated in article III, § 1 of the Constitution: "The legislative power of this state shall be vested in the senate and assembly." Thus the classic "separation of powers" between the executive and legislative branches is modified to some degree by our Constitution—a fact the dissent seems to ignore.

In the process prescribed by the Constitution, the Governor receives estimates from the heads of departments of their financial needs (NY Const, art VII, § 1). By the second Tuesday in January (or February 1, in the year after a gubernatorial election), the Governor submits a budget to the Legislature accompanied by "a bill or bills containing all the proposed appropriations and reappropriations included in the budget and the proposed legislation, if any, recommended therein" (NY Const, art VII, §§ 2, 3). The manner in which the Legislature may act on these bills is governed by article VII, § 4, the provision that is central to these cases. That section provides, in relevant part:

> "The legislature may not alter an appropriation bill
> submitted by the governor except to strike out or

reduce items therein, but it may add thereto items of appropriation provided that such additions are stated separately and distinctly from the original items of the bill and refer each to a single object or purpose. . . .

"Such an appropriation bill shall when passed by both houses be a law immediately without further action by the governor, except that . . . separate items added to the governor's bills by the legislature shall be subject to [the governor's line-item veto]."

The opening words of section 4 are taken verbatim from the proposal submitted to the voters, and defended by Stimson, in 1915. They accord to an "appropriation bill submitted by the governor" a special status; the Legislature may not "alter" it except in the ways specified. We have held that the no-alteration provision is "a limited grant of authority from the People to the Legislature to alter the budget proposed by the Governor, but only in specific instances" (*New York State Bankers Assn., Inc. v Wetzler*, 81 NY2d 98, 104 [1993]). In other words, all the power the Legislature has to alter the Governor's appropriation bills stems from article VII, § 4.

The Constitution provides that, absent a message of necessity from the Governor, the Legislature may not consider "any other bill making an appropriation" until it has finally acted upon all the Governor's appropriation bills (NY Const, art VII, § 5). Except for appropriations in the Governor's appropriation bills "and in a supplemental appropriation bill for the support of government," the legislation may make no appropriations "except by separate bills each for a single object or purpose" (NY Const, art VII, § 6). These separate bills, and the "supplemental appropriation bill," are subject to the Governor's line-item veto, which may be overridden by a two-thirds vote in the Legislature (*id.*; *see* NY Const, art IV, § 7). Article VII, § 6 contains the Constitution's only explicit substantive limitation on the content of an appropriation bill—the so-called "anti-rider" provision. The last sentence of article VII, § 6 provides:

"No provision shall be embraced in any appropriation bill submitted by the governor or in such supplemental appropriation bill unless it relates specifically to some particular appropriation in the bill, and any such provision shall be limited in its operation to such appropriation."

The effect of appropriations is limited to two years (NY Const, art VII, § 7).

These constitutional provisions implement Stimson's vision of executive budgeting—with the Governor as "constructor" and the Legislature as "critic." They do not, of course, leave the Legislature powerless. The Legislature can reduce or delete the Governor's appropriations and enact (subject to the Governor's veto) new appropriations of its own. It can pass legislation over the Governor's veto—as it has done in recent years with unprecedented frequency. Perhaps most important, the Legislature can—and almost invariably does—refuse to act on the budget pending negotiations with the Governor. All budgets within recent memory have been largely a product of such negotiations, often extremely protracted ones. The inefficiencies of New York's budgeting system are well known today, and much deplored; the word "gridlock" is often used. No one familiar with the process can believe that it is one in which the Governor is omnipotent, and the Legislature helpless.

Our decision today leaves all of the Legislature's constitutional prerogatives intact, but preserves the role of the Governor as the "constructor" of the State's budget.

## II. Facts and Procedural History

One of the present lawsuits, *Silver v Pataki*, arises out of the budget submitted by the Governor to the Legislature in 1998; the other, *Pataki v New York State Assembly*, out of the budget submitted in 2001. The appropriations made in those years have expired, so that the present controversy appears to be moot, but all parties and all members of the Court agree that the importance of the issues warrants our ruling on them (*see Matter of Hearst Corp. v Clyne*, 50 NY2d 707 [1980]).

A. *Silver v Pataki*

It is undisputed that the first step taken by each side to the dispute in 1998 was constitutional. The Governor submitted appropriation bills, as well as other legislation, to the Legislature; and the Legislature passed the appropriation bills without altering them, except to strike out or reduce particular items. The bills, as so modified, became law. But then the Legislature, by amending the Governor's other, nonappropriation budget bills, sought to change the appropriation legislation it had just enacted—not altering the amount of any appropriation, but altering the purposes for which, and the conditions upon which, the money could be spent.

For example, the Governor proposed, and the Legislature passed, an appropriation of $180 million to build a prison in Franklin County; but the Legislature shortly thereafter passed a bill providing that the funds would be available only when authorized by later legislation and that the prison must contain a separate building "suitable for educational, vocational, recreational and other inmate activities" (L 1998, ch 56, part C, § 2). Another appropriation item proposed by the Governor, and passed by the Legislature, provided $80.8 million for the "regulation program" of the Insurance Department; the Legislature's subsequent enactment provided that $48.2 million should be expended "under the regulation of insurance organizations program" and $32.4 million "under the regulation of insurance product program" (L 1998, ch 57, part A, § 11). This sort of thing occurred dozens of times.

The Governor claimed that the Legislature's subsequent actions altered his appropriation bills, in violation of article VII, § 4 of the Constitution. He purported to use his line-item veto to delete 55 of the provisions he considered invalid.

The Speaker of the Assembly brought suit against the Governor, seeking a declaratory judgment that the purported line-item vetoes were unconstitutional. The Senate later joined the case as a plaintiff. The Governor asserted, among other defenses, that "the items that were subject to the vetoes in question were unconstitutional and therefore void and unenforceable *ab initio.*" Supreme Court in substance upheld this defense, holding that the legislation the Governor objected to was invalid to begin with; Supreme Court therefore did not reach the question of whether the Governor's veto power was properly used. The Appellate Division affirmed. The Speaker and the Senate appealed as of right, pursuant to CPLR 5601 (b) (1), and we now affirm the Appellate Division's ruling.

B. *Pataki v New York State Assembly*

In 2001, in contrast to 1998, the first steps in the budget process were controversial. Certain of the bills submitted by the Governor as appropriation bills contained material which, according to the Legislature, did not belong in appropriation bills. For example, the Governor proposed to appropriate $8.3 billion for "general support for public schools for aid payable in the 2001-02 school year" and for "school-wide performance payments" (2001 NY Senate-Assembly Bill S 905, A 1305). The description of this appropriation in the bill contains 17 pages of

provisos and conditions, determining (based on pupil population, services provided and many other factors) how much money would go to each school district. In previous budgets, such extensive material had not been contained in appropriation bills; the complex formulas for dividing state education aid were contained in other proposed legislation submitted with the budget by the Governor.

The 2001 appropriation bills also contained language changing the method previously established by the Public Health Law for computing the Medicaid rates payable to residential health care facilities (2001 NY Senate-Assembly Bill S 904, A 1304); and appropriating funds for the State Museum and State Library to a proposed Office of Cultural Resources, though these entities were, by statute, under the control of the Department of Education and Board of Regents (2001 NY Senate-Assembly Bill S 905, A 1305). These provisions and many others, in the view of the Legislature, could not properly be included in "appropriation bills" that were protected from alteration by article VII, § 4.

The Legislature purported to delete from the Governor's appropriation bills some of the language it considered unconstitutional. In other cases, the Legislature struck whole items of appropriation (as it indisputably had a right to do), and then enacted its own appropriation bills, appropriating identical amounts of money for similar purposes, but subject to different conditions and restrictions. In doing this, the Legislature purported to act pursuant to article VII, § 6 of the Constitution, which authorizes it, after passing or rejecting the Governor's appropriation bills, to make its own appropriations "by separate bills, each for a single object or purpose"; the Legislature passed 37 such "single purpose bills." Finally, in some instances the Legislature adopted the same technique it had used in 1998: enacting the Governor's appropriation as submitted, but then amending the appropriation by making changes in the Governor's other budget legislation.

The Governor, though contending that the 37 single-purpose bills and certain of the other bills passed by the Legislature were unconstitutional, signed them all. He then immediately began this action against the Assembly and the Senate. The Governor sought a declaration that the bills in question were unconstitutional; the Assembly and Senate counterclaimed seeking, among other things, a declaration that the provisions in the Governor's appropriation bills to which the Legislature objected

were invalid. Supreme Court ruled for the Governor and the Appellate Division affirmed, with two Justices dissenting on the ground that the Governor lacked standing. The Assembly and the Senate appealed as of right pursuant to CPLR 5601 (b) (1) (the Assembly relying also on CPLR 5601 [a]). We now affirm the Appellate Division's ruling.

## III. Discussion

### A. Preliminary Issues

In *Silver v Pataki* (96 NY2d 532 [2001]), we decided that Speaker Silver had capacity and standing, as a member of the Assembly, to bring the case relating to the 1998 budget. The Governor raises no other issue that would bar us from reaching the merits of that case. In *Pataki v New York State Assembly*, however, the Assembly argues that: (1) the Governor, having signed the legislation he complains of, lacks standing to bring this case; and (2) the Governor's suit is barred by the Speech or Debate Clause of the State Constitution (NY Const, art III, § 11 ["For any speech or debate in either house of the legislature, the members shall not be questioned in any other place"]). The Senate, apparently preferring to see the case decided on the merits, does not raise either a standing or a Speech or Debate Clause defense.

Both of these defenses, assuming them to be valid, may be waived (*see* CPLR 3018 [b]; *Matter of Fossella v Dinkins*, 66 NY2d 162, 167-168 [1985]). Since the Senate has waived them, it makes no practical difference in this case whether they are validly asserted by the Assembly. All three parties seek declaratory relief only, and the declaration that results from our decision will be exactly the same whether or not the claims against the Assembly are dismissed. We therefore think it unnecessary to decide the standing or Speech or Debate issue, and we proceed to the merits (*cf. Powell v McCormack*, 395 US 486, 501-502 [1969] [where certain defendants could not plead the bar of the Speech or Debate Clause, it was held unnecessary to discuss the issue as it affected the other defendants]).

### B. The Merits

#### 1. *Silver v Pataki*

It is undisputed that the effect of the legislation at issue in *Silver v Pataki* was to amend language originally proposed by the Governor in his 1998 appropriation bills. The Governor contends that this violated the plain terms of article VII, § 4:

"The legislature may not alter an appropriation bill submitted by the governor except to strike out or reduce items therein. . . ." The Legislature contends that it did not violate the no-alteration clause because: (1) it did not amend the appropriation bills before passing them, but passed them unchanged and then amended them by subsequent legislation; and (2) the amendments changed only the language describing the purposes of, and the conditions on, the appropriations, not the amounts appropriated. We find both of the Legislature's contentions to be untenable.

If the no-alteration clause of article VII, § 4 were read to prohibit only amendments to appropriation bills before passage, not subsequent amendments, it would be a completely formal, ineffectual requirement. The Legislature could discard the Governor's budget and enact its own, by the simple procedure of passing his appropriation bills and then amending them out of existence. Executive budgeting would be replaced by legislative budgeting. The whole purpose of the no-alteration clause, as Stimson explained it in 1915, was to assure that the Legislature remains "a critic" of the budget and does not become "a rival constructor." Stimson's warning is apposite here: If a Governor's budget may be "wholly superseded by a new legislative budget . . . you would have nothing."

Nor are we persuaded by the Legislature's argument that subsequent legislation may amend the words of appropriation bills, so long as it leaves the dollar amounts untouched. In the first place, the text of article VII, § 4 was obviously not intended to prohibit changes only in the amounts appropriated. Indeed, article VII, § 4 expressly *permits* changes in the amounts so long as they are changed downward: the Legislature may "strike out or reduce items" in the Governor's budget. If the authors of the no-alteration clause had meant to say only that the Legislature "may not increase" the amount of any appropriation they could have said so; they would not have used the cumbersome phrase "may not alter . . . except to strike out or reduce."

Furthermore, the theory that the Legislature can rewrite the text of the Governor's appropriation bills is inconsistent with the basic idea of executive budgeting. The author of a budget must make the initial decision not only on how much money is to be spent, but on what the money is to be spent for. The Legislature acknowledges that in a broad sense this is true; counsel for the Assembly admitted at oral argument that, if the

Governor's appropriation bills appropriated money for a prison, subsequent legislation could not strike out the word "prison" and substitute the words "football stadium." But the Legislature contends that it is free to make changes of narrower scope—to change, for example "prison in Syracuse" to "prison in New York City."

We doubt that a meaningful line between broad and narrow changes could ever be drawn. But more fundamentally, to permit the Legislature to rewrite the details of the Governor's budget, as embodied in his appropriation bills, is inconsistent with the aims of the executive budget system. It is the Governor, not the Legislature, who was expected by the framers of this constitutional provision to "lie awake nights" to produce "an economical and systematic plan for the annual budget of the State" (*see, supra* at 82). That "systematic plan" must be based on the Governor's judgment not only on how much money to spend, but on which specific expenditures are prudent, and what preconditions should be imposed on them. The Governor will be able to perform his constitutional role only if the no-alteration clause of article VII, § 4 applies to the details of the appropriation bills he submits to the Legislature.

The Legislature's argument is contrary not only to the basic theory of executive budgeting, but also to our decision in *New York State Bankers Assn. v Wetzler* (81 NY2d 98 [1993]). In *Bankers*, the Legislature had added to an appropriation bill a provision authorizing the Department of Taxation and Finance to charge banks a fee for the cost of conducting bank audits. The provision did not disturb the amount the Governor had allocated to cover the audits. Yet we concluded that the Legislature's addition to the Governor's appropriation violated the no-alteration clause. And even before *Bankers*, opinions by Attorneys General Lefkowitz and Abrams contradicted the idea that the Legislature may revise language included by the Governor in an appropriation bill (1978 Ops Atty Gen 76; 1982 Ops Atty Gen No. 82-F5).

If the Legislature disagrees with the Governor's spending proposals, it is free, as the no-alteration clause provides, to reduce or eliminate them; it is also free to refuse to act on the Governor's proposed legislation at all, thus forcing him to negotiate. But it cannot adopt a budget that substitutes its spending proposals for the Governor's. If it could do so, executive budgeting would no longer exist.

We therefore conclude that the 55 legislative provisions as to which the Governor purported to exercise his line-item veto were invalid under article VII, § 4 of the State Constitution. That makes it unnecessary for us to determine whether the line-item veto was properly exercised; the legislation was invalid whether it was vetoed or not.

2. *Pataki v New York State Assembly*

In defending its actions with respect to the 2001 budget, the Legislature makes essentially two arguments. First, it repeats, in a slightly different context, the argument we have just rejected—that the Legislature may, without violating the no-alteration clause, enact subsequent legislation (mostly taking the form, in this case, of single-purpose bills) that effectively amends appropriation legislation proposed by the Governor in ways not authorized by the no-alteration clause. Secondly, the Legislature argues that the bills proposed as "appropriation bills" by the Governor, were, in significant part, not appropriation bills within the meaning of the Constitution and were thus not protected by the no-alteration clause. We reject both arguments.

(a) The Use of Single-Purpose Bills as Substitutes for Appropriation Bills

What we said in our discussion of *Silver v Pataki* largely disposes of the Legislature's first argument, though the technique the Legislature used in 2001 was, in most instances, different from the one used in 1998. Whereas in 1998 the Legislature passed the Governor's appropriation bills and then tried to alter them by amending other budget legislation, in 2001 it more frequently struck out items from the Governor's appropriation bills and then replaced them by single-purpose bills, which it purported to enact under the authority given it by article VII, § 4 to "add . . . items of appropriation provided that such additions are stated separately and distinctly from the original items of the bill and refer each to a single object or purpose." This use of single-purpose bills is no different in principle from the use of other legislation to amend appropriation bills, and it is no less contrary to the idea of executive budgeting.

Indeed, we pointed out 65 years ago that using single-purpose legislation to substitute for items deleted from the Governor's appropriation bills would violate the Constitution. In the second of two cases named *People v Tremaine* (281 NY 1 [1939] [*Tre-*

*maine II*]), we said, referring to the "single object or purpose" clause of article VII, § 4:

> "[The Legislature] may . . . add items of appropriation, provided such additions are stated separately and distinctly from the original items of the bill and refer each to a single object or purpose. *The items thus proposed by the Legislature are to be additions, not merely substitutions.* These words have been carefully chosen. *The added items must be for something other than the items stricken out.*" (Emphasis added.)

There may be cases in which it is difficult to say whether a single-purpose bill passed by the Legislature is an "addition" to, rather than a "substitution" for, a deleted item. We do not suggest, as the dissent implies, that every bill originated in the Legislature that touches on the same subject matter as an appropriation is unconstitutional. Of course, the Legislature remains free to legislate on such subjects as the way in which prisons should be operated (*see* dissenting op at 119-120). The question is simply whether the challenged legislation does or does not alter an appropriation bill submitted by the Governor.

In this case the question is not difficult. It is clear from the Legislature's own description of the bills it defends that they are substitutes for items in the Governor's appropriation bills. The Assembly argues that these bills "did not have the same purpose as the Governor's proposals," but it bases this argument on the assertion that its bills "modified the terms and conditions of the Governor's appropriations" and in some cases "directed the funding to different agencies or institutions." In other words, the appropriation bills were altered.

It is undisputed that each of the single-purpose bills at issue had its counterpart in the Governor's appropriation bills, and that the Legislature, in each case, replaced provisions it did not like with provisions it preferred. The no-alteration clause does not permit the Legislature to treat the Governor's appropriation bills in this manner.

(b) The Content of Appropriation Bills

The Legislature's second argument—that what the Governor called "appropriation bills" in 2001 were, in significant part, not appropriation bills within the meaning of the Constitution—presents, at least in theory, a troublesome issue, for we recognize that the Governor's power to originate appropriation

bills is susceptible to abuse. A Governor could insert into what he labeled "appropriation bills," and thus could purport to shield by the no-alteration clause, legislation whose primary purpose and effect is not really budgetary. A few hypothetical questions may illustrate the point: Could a Governor raise a mandatory retirement age for firefighters, by making the higher age a condition of appropriations to fire departments? Could a Governor insert into an appropriation bill for state construction projects a provision that Labor Law § 240 (the scaffold law) would be inapplicable? Could an appropriation bill provide that workers in certain state-financed activities were free to engage in conduct the Penal Law would otherwise prohibit? Each of these proposals seems to go beyond the legitimate purpose of an appropriation bill.

The Governor's position in this litigation is that the only limit on the content of an appropriation bill submitted by the Governor is the anti-rider clause of article VII, § 6: "No provision shall be embraced in any appropriation bill submitted by the governor . . . unless it relates specifically to some particular appropriation in the bill, and any such provision shall be limited in its operation to such appropriation." This is a less than satisfactory answer, because it is quite possible to write legislation that plainly does not belong in an appropriation bill, and yet "relates specifically to" and is "limited in its operation to," an appropriation. The hypotheticals offered in the previous paragraph are, at least arguably, of that description.

Thus we reject the sweeping proposition, attributed to us by the dissent, "that what the Governor sees fit to include in an appropriation bill is properly placed there" (dissenting op at 115). Some matters are not "properly placed there." We also reject, however, the dissent's suggestion that no "public policy matters" (*id.* at 105) or "substantive or programmatic" legislation (*id.* at 114 n 8) properly belong in an appropriation bill. The line between "policy" and "appropriations" is not just thin, but essentially nonexistent: every dollar the State spends is spent on substance, and the decision of how much to spend and for what purpose is a policy decision. Thus all appropriations are substantive, and all appropriations make policy. It is true that there can be substantive legislation that does not contain appropriations—as demonstrated by the cases from other states, cited by the dissent (at 112-113), in which nonappropriation legislation was held not to be subject to a line-item veto. But the converse is not true—there cannot be a "nonsubstantive" appropriation bill.

Thus, we agree with the dissent that "choices pertaining to the statewide allocation of resources among school districts involve policy determinations" (*id.* at 116). But "allocation of resources" is almost a definition of what an appropriation bill does. The dissent errs in saying that appropriation bills cannot be used to make "policy determinations" that are "fundamentally legislative" (*id.*). The purest and simplest appropriation bill imaginable—the example chosen by the dissent, Governor Franklin D. Roosevelt's bill to fund an investigation of securities sales (*id.* at 104)—was plainly the legislative embodiment of a substantive policy choice.

The dissent admits that the line between appropriations and policy is "difficult to fix" (*id.* at 111). The dissent therefore abandons, if we read it correctly, the idea of judicially-imposed limits on "what the Governor can do in an appropriation bill," and addresses instead "what the Legislature can do in response" (*id.*). The dissent's answer seems to be that the Legislature can do anything it wants to the language of an appropriation bill, as long as it does so by separate legislation, rather than by amending the appropriation bill itself. According to the dissent, the 1929 Legislature could have, after passing Governor Roosevelt's appropriation for an investigation of securities sales, passed other legislation conditioning the expenditure as the Legislature saw fit. Or it could have stricken the proposed appropriation and passed single-purpose legislation redirecting the funds to an investigation of bribery in municipal contracts, or any other purpose the Legislature liked—and it could have treated every one of Governor Roosevelt's other proposed appropriations in a similar fashion. We reject the dissent's argument for the reasons explained in previous sections of this opinion: to accept it would be to countenance the effective abolition of executive budgeting.

While we do not agree with the dissent that it is wrong to put "substantive" matter into an appropriation bill, we acknowledge, as we have said, that a Governor should not put into such a bill essentially nonfiscal or nonbudgetary legislation— measures like the hypothetical ones suggested at pages 92-93 of this opinion. We do not find it necessary to answer in this case the question of what is to be done when a Governor does include such unsuitable material; but we will try to advance understanding of the question by exploring it briefly.

The Governor argues, in substance, that no judicial remedy should be available when an appropriation bill contains mate-

rial which, though not prohibited by the anti-rider clause, ought not to be there. He points out that political considerations may well deter a future Governor from inserting such material—and that, if he does insert it, the Legislature does not have to pass the bill. The Governor argues that, if an uncontroversial or popular appropriation is accompanied by an unsuitable condition or proviso that is not barred by the anti-rider clause, the Legislature's remedy is to refuse to enact the appropriation until the offending material is removed. The result may be a stalemate that will be resolved one way or another without judicial intervention—in other words, a check on gubernatorial abuse by political means.

The Governor suggests that the problem of inappropriate content in an appropriation bill is analogous to the problems of itemization and transfer of appropriations—problems with which we have struggled in previous cases, and which we eventually left to be resolved in the political process. In the first case entitled *People v Tremaine* (252 NY 27 [1929] [*Tremaine I*]), the Governor submitted a budget bill containing lump-sum, rather than itemized, appropriations, with a provision stating that he alone could later decide how the lump sums should be broken down or "segregated." The Legislature struck out the items to which the Governor had attached such provisions, and restated them with clauses calling for the participation of legislators in the segregation process. We disposed of the case on other grounds, but remarked in dictum that the Legislature appeared to have violated the no-alteration clause of what is now article VII, § 4 (252 NY at 47-48). We then added:

> "If the Legislature may not add segregation provisions to a budget bill proposed by the Governor without altering the appropriation bill, . . . it would necessarily follow that the Governor ought not to insert such provisions in his bill. He may not insist that the Legislature accept his propositions in regard to segregations without amendment, while denying to it the power to alter them. The alternative would be the striking out the items of appropriation thus qualified in toto and a possible deadlock over details on a political question outside the field of judicial review." (*Id.* at 50.)

Thus, in *Tremaine I* we said that the Governor "ought not to" put "segregation provisions" into a lump-sum appropriation bill, but also suggested that his doing so might generate "a political question outside the field of judicial review."

In 1939, in *Tremaine II*, we implied in dictum that there are constitutional limits on the Governor's choice between lump sums and itemizations, saying "we expect the appropriation bill to contain items . . . sufficient to furnish the information necessary to determine whether in the judgment of the Legislature all that is demanded should be granted or is required" (281 NY at 5). Decades later, in *Saxton v Carey* (44 NY2d 545 [1978]), we decided that this issue is one for the political process, not the courts, adopting in substance the dissenting opinion of Judge Breitel in *Hidley v Rockefeller* (28 NY2d 439 [1971]). While we reiterated in *Saxton* that "the Governor is required to submit an 'itemized' budget" (44 NY2d at 548), we held that the remedy for violations of that requirement lay with the Legislature itself:

> "[T]he degree of itemization necessary in a particular budget is whatever degree of itemization is necessary for the Legislature to effectively review that budget. This is a decision which is best left to the Legislature, for it is not something which can be accurately delineated by a court. It is, rather, a function of the political process, and that interplay between the various elected representatives of the people which was certainly envisioned by the draftsmen of the Constitution. Should the Legislature determine that a particular budget is so lacking in specificity as to preclude meaningful review, then it will be the duty of that Legislature to refuse to approve such a budget. If, however, as here, the Legislature is satisfied with the budget as submitted by the Governor, then it is not for the courts to intervene. . . . Should a Legislature fail in its responsibility to require a sufficiently itemized budget, the remedy lies not in the courtroom, but in the voting booth." (*Id.* at 550-551.)

We reached a similar conclusion in *Saxton* as to the extent to which a Governor's appropriation bill could authorize transfers of appropriation within programs or departments (*id.*). Yet we also disavowed in *Saxton* any suggestion that "the budgetary process is per se always beyond the realm of judicial consideration." (*Id.* at 551.) We said: "The courts will always be available to resolve disputes concerning the scope of that authority which is granted by the Constitution to the other two branches of the government." (*Id.*)

Our cases, in short, reflect the ambivalence we express today about the use of judicial power to resolve disputes over budgeting between the executive and legislative branches. Today we do not reject, but we also do not endorse, the Governor's argument that no judicial remedy is available (where the anti-rider clause does not apply) for gubernatorial misuse of appropriation bills. The dissent makes a valid point that political stalemate over a budget is an unattractive prospect. On the other hand, to invite the Governor and the Legislature to resolve their disputes in the courtroom might produce neither executive budgeting nor legislative budgeting but judicial budgeting—arguably the worst of the three.

When a case comes to us in which it appears that a Governor has attempted to use appropriation bills for essentially nonbudgetary purposes, we may have to decide whether to enforce limits on the Governor's power in designing "appropriation bills" or to leave that issue, like the issues of itemization and transfer, to the political process. We conclude, however, that we confront no such problem here, for there is nothing in the appropriation bills before us that is essentially nonbudgetary. All of the appropriation bills that the Legislature challenges are, on their face, true fiscal measures, designed to allocate the State's resources in the way the Governor thinks most productive and efficient; none of them appears to be a device for achieving collateral ends under the guise of budgeting.

This is well illustrated by the bill the Legislature most vigorously attacks—the school funding proposal (2001 NY Senate-Assembly Bill S 905, A 1305). The purpose and effect of this proposed item of appropriation is to determine how much of the State's money goes to each school district—almost as purely budgetary a question as can be imagined. Whether to include the allocation of funds to school districts in an appropriation bill or in other budget legislation is a political choice; nothing in the Constitution forbids the choice of an appropriation bill.

The Legislature, and the dissent, in substance offer three reasons why the Governor's 2001 school funding proposal does not belong in an appropriation bill. First, they point out—correctly—that the bill does not *look* like a typical appropriation bill; rather than briefly identifying recipients of funds and specifying the dollars to be received by each, it contains many pages of narrative with no numbers at all. The narrative, however, is merely a very complex formula, or series of formulas, for distributing the money, and a rule prohibiting an appropria-

tion bill from taking this approach would be both formalistic and unworkable. There could be no objection on constitutional grounds if the bill, instead of reciting the formula, named every school district in the state and specified the sum that would go to each—in other words, if the authors of the bill had applied the formula themselves and written the result into proposed legislation. Nor would there be a valid constitutional objection to an appropriation bill that distributed dollars by a simple formula—x dollars per pupil, for example. The bill is not less an "appropriation bill" because the formula it uses is complex—or because, as the dissent emphasizes, the formula occupies 17 pages, rather than a page or two.

Secondly, the Legislature and the dissent point out that, until 2001, the details of distribution of school aid had usually not been the subject of appropriation bills, but of other legislation submitted with the Governor's budget. We decline, however, to adopt a narrow historical test of what is an "appropriation bill"—to require, in effect, that the Governor may never use an appropriation bill to deal with subject matters addressed by other types of legislation in the past. Nothing in the Constitution says or implies that, once it becomes customary to deal with a particular subject either in appropriation bills or in other legislation, the custom must be immutable. On the contrary, it was an important part of the purpose of executive budgeting to enable budgets to be adjusted to the changing needs of an increasingly complex society. Also, it would involve courts in endless difficulties if they had to determine, every time the validity of an appropriation bill was challenged, whether the particular subject of the bill was being dealt with in accordance with historical practice.

Thirdly, the Legislature notes, and the dissent emphasizes heavily, that the Governor's 2001 school funding proposal altered existing statutory provisions for the distribution of school aid. But the Legislature does not even argue, and could not successfully argue, that it is forbidden for an appropriation bill—whose effect is limited to two years by the Constitution (art VII, § 7)—to supersede existing law for that time. The Governor points out that appropriation bills superseded other legislation long before executive budgeting was adopted, and have continued to do so since. To permit the Legislature, by ordinary legislation, to limit the Governor's flexibility in making future budgetary choices would seriously endanger the whole structure of executive budgeting. For this reason, the dis-

sent is simply wrong in saying that, if the Governor had written the result of a formula into an appropriation bill, he "would be required to apply the formula codified in Education Law § 3602" (dissenting op at 115). An appropriation that is effective notwithstanding other law to the contrary is still a legitimate appropriation. Indeed, one of the single-purpose appropriation bills that the dissent would uphold as valid is of that description (*see* 2001 NY Senate-Assembly Bill S 5742, A 9353).

In short, we conclude that the 2001 school funding proposal raises none of the concerns that might be raised by the insertion of essentially nonbudgetary legislation into an appropriation bill. The Governor's choice to use an appropriation bill, rather than other budget legislation, as the means of distributing school aid may have been politically controversial, but it was clearly within the authority given him by the Constitution.

Nor do we find that any of the other proposed measures that the Legislature challenges in this case are an attempt to abuse the Governor's power over appropriation bills. The Legislature contends that the Governor abused his power by using appropriation bills to transfer the State Library and State Museum to the control of a newly created Office of Cultural Resources; this contention, however, seems to be based on a misreading of the legislation the Governor submitted. The Governor proposed other budget legislation, not appropriation bills, to create the new agency and to transfer the Library and Museum to it. This other legislation was rejected by the Legislature (*see* 2001 NY Senate-Assembly Bill S 1145-B, A 1997-B). The Governor's appropriation bills did include provisions for funds to the Office of Cultural Resources for the purpose of operating the State Library and State Museum, but that shows only that the Governor was proceeding on the assumption—which proved ill-founded—that legislation creating that entity would be passed.

We therefore leave for another day the question of what judicially enforceable limits, if any, beyond the anti-rider clause of article VII, § 6 the Constitution imposes on the content of appropriation bills.

### IV. Conclusion

Accordingly, in each case, the order of the Appellate Division should be affirmed without costs.

ROSENBLATT, J. (concurring). I join Judge Robert Smith's

plurality writing, and thus make a majority, in ruling that the orders of the Appellate Division should be affirmed. Contrary to the view expressed by our dissenting colleagues, I believe that, in the cases before us, the Legislature violated the State Constitution's no-alteration clause[1] while the Governor did not go beyond the relevant constitutional limits in his appropriation bills. I need not expand on the reasons for that conclusion because they are explained in the plurality's writing. That said, I concur separately because, while I agree with the result, I find the plurality writing not fully satisfying, and am unwilling to subscribe to its every premise.

The Governor argues that two words in article VII, § 6 of the New York Constitution are pivotal. The section prohibits the Executive from including in an appropriation bill any provision that does not *relate specifically* to some particular appropriation. The section goes on to say that any such provision must be limited in its operation to an appropriation.

The clause was designed to preserve the separation of powers, a concept that goes back to our first State Constitution in 1777—written a decade before the United States Constitution.[2] In its first such effort, our fledgling State provided that the legislative power is vested in the Senate and Assembly.[3] That provision has been with us throughout our constitutional history (*see* 1821 NY Const, art I, § 1; 1846 and 1894 NY Const, art III, § 1). Our state framers also recognized that governmental powers cannot be neatly separated into pigeonholes, and so they used general language to reinforce the idea that while the Governor has considerable powers, the legislative branch—and not the Executive—is the primary lawmaking body.

Given this background, the plurality writing does not go far enough to describe where the line exists so as to protect the Legislature's lawmaking preeminence. It is not enough to point

---

**1.** NY Const, art VII, § 4 ("The legislature may not alter an appropriation bill submitted by the governor except to strike out or reduce items therein, but it may add thereto items of appropriation provided that such additions are stated separately and distinctly from the original items of the bill and refer each to a single object or purpose").

**2.** Indeed, on our soil, the concept goes back even a century before that, while we were under colonial rule (*see* 1 Lincoln, The Constitutional History of New York, at 30 [1906]).

**3.** Article II of the 1777 Constitution provided "that the supreme legislative power within this State shall be vested in two separate and distinct bodies of men; the one to be called the assembly of the State of New York, the other to be called the senate of the State of New York; who together shall form the legislature, and meet once at least in every year for the despatch of business."

out—as Judge Smith aptly does—that the power to originate appropriation bills is susceptible to abuse (*see* plurality op at 91). To illustrate the problem, the plurality asks a few hypothetical questions: "Could a Governor raise a mandatory retirement age for firefighters, by making the higher age a condition of appropriations to fire departments? Could a Governor insert into an appropriation bill for state construction projects a provision that Labor Law § 240 (the scaffold law) would be inapplicable? Could an appropriation bill provide that workers in certain state-financed activities were free to engage in conduct the Penal Law would otherwise prohibit?" (Plurality op at 93.)

The plurality then says that the proposals "seem[ ]" to go beyond the legitimate purpose of an appropriation bill (plurality op at 93). In my view, they do, and it is essential to say so. Anything short of that leaves the parties—and here they are those who run the government—with not an ounce of guidance.

Our colleagues in the plurality doubt that a line can be drawn delineating gubernatorial and legislative powers. We are, however, in the business of drawing lines; that is what we do in our decisional law. I recognize that it is not normally our job to give guidance to the other two branches. This, however, is no ordinary lawsuit: not one, but both branches have gone out of their way to demand an answer. We would, I think, be failing in our duty if we punted and simply announced that if and when a case ever arises in which the executive branch goes too far, perhaps we will let you know.

That approach disserves the Legislature and does not give the Governor a clue as to whether he is trespassing on legislative turf. Saying only that we cannot draw a line but that, in effect, "I know it when I see it"[4] is an unacceptable response. A proper resolution of these lawsuits requires a test, consisting of a number of factors, no single one of which is conclusive, to determine when an appropriation becomes unconstitutionally legislative. To begin with, anything that is more than incidentally legislative should not appear in an appropriation bill, as it impermissibly trenches on the Legislature's role. The factors we consider in deciding whether an appropriation is impermissibly legislative include the effect on substantive law, the durational impact of the provision, and the history and custom of the budgetary process.

---

4. *Jacobellis v Ohio* (378 US 184, 197 [1964] [Stewart, J., concurring] [defining obscenity in the context of First Amendment protections]).

In determining whether a budget item is or is not essentially an appropriation, one must look first to its effects on substantive law. The more an appropriation actively alters or impairs the State's statutes and decisional law, the more it is outside the Governor's budgetary domain. A particular "red flag" would be nonpecuniary conditions attached to appropriations.

History and custom also count in evaluating whether a Governor's budget bill exceeds the scope of executive budgeting. The farther a Governor departs from the pattern set by prior executives, the more resulting budget actions become increasingly suspect. I agree that customary usage does not establish an immutable model of appropriation (*see* plurality op at 98). At the same time, it would be wrong to ignore more than 70 years of executive budgets that basically consist of line items.

The more an executive budget strays from the familiar line-item format, the more likely it is to be unauthorized, nonbudgetary legislation. As an item exceeds a simple identification of a sum of money along with a brief statement of purpose and a recipient, it takes on a more legislative character. Although the degree of specificity the Governor uses in describing an appropriation is within executive discretion (*see People v Tremaine*, 281 NY 1 [1939]), when the specifics transform an appropriation into proposals for programs, they poach on powers reserved for the Legislature.

In addition, the more a provision affects the structure or organization of government, the more it intrudes on the Legislature's realm. The executive budget amendment contemplates funding—but not organizing or reorganizing—state programs, agencies and departments through the Governor's appropriation bills.

The durational consequences of a provision should also be taken into account. As budget provisions begin to cast shadows beyond the two-year budget cycle, they look more like nonbudget legislation. The longer a budget item's potential lifespan, the more legislative is its nature. Similarly, the more a provision's effects tend to survive the budget cycle, the more it usurps the legislative function.

Viewed in light of these factors, the Governor's proposals relating to the State Museum and State Library appear to push the edge of the envelope because of their effect on the structure and organization of government agencies. I am satisfied, however, with Judge Smith's explanation that the Governor did

not purport to restructure or realign these state agencies but merely appropriated money anticipating the Legislature's creating a new agency (*see* plurality op at 99). Had the Governor simply decreed this sort of reorganization in an appropriation bill, I would hold the action unconstitutional.

Judge Smith's hypotheticals, however, would run afoul of the constitutional limits on the Governor's appropriation power. Although the hypothetical provisions arguably "relate[ ] specifically" to the appropriation, all three appreciably alter existing substantive law that is not inherently budgetary and would, therefore, transgress constitutional limits. While there are financial implications of retirement ages, Labor Law § 240 and various provisions of the Penal Law, none is fundamentally or primarily fiscal. In contrast, a formula that calculates how much to allocate to a program—such as the education provision at issue—is tied up in the appropriation and would therefore fall within the Governor's budgetary powers.

I readily concede that this or any other test is necessarily imperfect. To my mind, however, it is better than no test at all. We have an obligation to reveal the considerations involved in evaluating the challenged provisions and reaching our conclusion. Determining the constitutional scope of the legislative and executive powers is, after all, a basic function of the judicial branch.

Chief Judge KAYE (dissenting). At the heart of both cases before us, arising in the context of the State's budget, is the line between the Executive and the Legislature with respect to lawmaking.

In 1927, New York amended its Constitution to adopt executive budgeting. In article VII, the Constitution confers upon the Governor initial responsibility for proposing to the Legislature a coherent statewide plan for government spending; the Legislature then may not alter the Governor's appropriation bill,[1] except to strike out or reduce items in the bill, but the

---

1. An "appropriation bill" is "a bill or bills containing all the proposed appropriations and reappropriations included in the budget" (NY Const, art VII, § 3). An "item" of appropriation is contained within an appropriation bill (*see* NY Const, art VII, § 4). A "nonappropriation bill," which may also be part of the Governor's budget submission to the Legislature, "contain[s] programmatic provisions and commonly include[s] sources, schedules and suballocations for funding provided by appropriation bills, along with provisions authorizing the disbursement of certain budgeted funds pursuant to

Legislature may add items of appropriation provided they are stated separately and distinctly from the original items and refer each to a single object or purpose (*see* NY Const, art VII, § 4). Generally, however, lawmaking power remains with the Legislature. Article III of our Constitution commands that "[t]he legislative power of this state shall be vested in the senate and assembly" (NY Const, art III, § 1).

For 70 or more years our constitutional budgeting scheme has operated with more or less success[2]—but without a major showdown in the courts—until, in 1998 and again in 2001, the two sides for the first time reached an impasse precipitating the present litigation. What happened?

To my mind the problem is exemplified by two items of appropriation included in the record before us. The first is contained in Governor Franklin Roosevelt's 1929 appropriation bill, offered just after passage of the Executive Budgeting Amendment. The item reads in full: "Investigation of Sale of Securities and Unlawful Corporative Activities, Services and expenses—$210,000.00." My second example, a stark contrast, is contained in Governor Pataki's 2001 appropriation bill: a so-called item of appropriation in the form of 17 closely-printed pages altering Education Law § 3602 for funding public schools throughout the state. As the Court recognizes, this was the first time the Governor attempted to amend the school-funding formula in an appropriation bill (*see* opinion at 86-87).

Two questions are at the core of this appeal. Does the authority to propose the budget permit the Governor to rewrite the substantive law of the state as an item of appropriation? Or perhaps even more to the point, if the Governor proposes new substantive law in a budget bill—either an appropriation bill or a nonappropriation bill—is the Legislature then prohibited by the no-alteration provision of article VII, § 4 from changing such proposals, limited merely to voting the proposed appropriation up or down? In the 2001 example, to be more particular, is the Legislature's only choice to accept the Governor's proposed significant amendment of the Education Law or defund the public schools?

While answering these questions in the affirmative, my Colleagues themselves recognize that the issue is "troublesome"

---

subsequent legislative enactment" (*Silver v Pataki*, 96 NY2d 532, 535 n 1 [2001] [*Silver I*]).

**2.** *See e.g.* Gerald Benjamin, *Reform in New York: The Budget, The Legislature, and the Governance Process*, 67 Alb L Rev 1021 (2004).

and the Governor's power they now rubber-stamp "is susceptible to abuse" (opinion at 92-93). I agree, but conclude that it has been abused here. Given the substantive law amendments now accepted by my Colleagues as items of appropriation, it is hard to imagine, for the future, what could not be cast as an item of appropriation subject to the no-alteration rule. Nor is it a sufficient answer, or safeguard, that the Court finds the challenged appropriation items "true fiscal measures" (*id.* at 97), for a bridge can readily be constructed between a wide range of public policy matters and public dollars.

Because I conclude that the Governor has overstepped the line that separates his budget-making responsibility from the Legislature's lawmaking responsibility, setting an unacceptable model for the future, I dissent.[3]

## I. The History and Intent of Executive Budgeting

Prior to 1915, the State operated under a legislative budget system in which—as with most legislation—the Legislature proposed bills, in this case appropriation bills, and presented them to the Governor for his signature or veto. These bills were based on budgetary estimates provided to the Legislature by the various executive departments. The Legislature, however, had neither the staff nor the resources to exercise appropriate oversight in scaling back departmental wish lists. Instead, departments submitted their estimated expenditures without any review by an authority outside the department, resulting in

---

3. Indeed, these cases speak only to the future. The 1998 and 2001 budget issues have long been moot. Although there are two cases before us—*Silver v Pataki* from 1998 and *Pataki v New York State Assembly and New York State Senate* from 2001—the central issue in both is the same, as the Court recognizes (*see* opinion at 91). In 1998, unlike in 2001, the Governor did not include substantive law proposals in his appropriation bills. But the Legislature amended his *non*appropriation bills by further itemizing the appropriated funds, imposing criteria for their implementation or conditioning their disbursement on further legislative action. The Governor exercised the line-item veto with respect to these amendments, contending that the Legislature's actions in effect altered his items of appropriation in violation of article VII, § 4, and were therefore unconstitutional. In 2001, the Governor did include substantive law proposals as items of appropriation. The Legislature responded by striking the substantive provisions from the appropriation bills; amending, as in 1998, nonappropriation bills; and enacting 37 single-purpose appropriation bills. Thus, the issue presented in the 1998 case concerning the authority of the Legislature to amend the Governor's budget submissions is subsumed within the 2001 case, in which the Legislature sought to amend the Governor's budget using similar means as well as others. The earlier case, however, presents an additional issue involving the Governor's use of the line-item veto.

very high estimates (*see* Journal, 1915 NY Constitutional Convention, at 390). Further, because funds were appropriated piecemeal in numerous different bills, no comprehensive budget plan was ever formulated or presented to the public (*see id.* at 392). In addition, by 1915 it had become apparent that—because members of the Legislature were beholden to their districts rather than to the state as a whole—legislative budgeting produced wasteful pork barrel spending without any responsible assessment of relative budget priorities.

In reaction, a reform movement arose to adopt an executive budgeting process. The scheme is a simple one. The Governor—as an elected official answerable to the entire state—would in the first instance have responsibility for collecting departmental estimates and proposing appropriations. Free as he[4] was from the limitations faced by the Legislature, it was thought that the Governor, who had direct supervisory control over administrative departments, could better determine whether the estimates proffered by his department heads were reasonable, and could send his officers back to the drawing board to revise their estimates if he found them overblown. In this way, a realistic and comprehensive assessment of the financial needs of government could be had. Then, once proposed as a package, the budget would be reviewed by the Legislature, which would be restricted in its ability to increase spending beyond the levels proposed by the Executive after his careful deliberation.

Specifically, the Legislature could reduce spending for a particular item of appropriation, or forgo funding of the item altogether, but it could not increase the amount of money for any given item in the Governor's appropriation bills. Since the spending caps had already been approved by the Governor who proposed them, the appropriations would become law immediately upon passage by the Legislature. Further, if the Legislature sought to fund additional programs or services not provided for in the Governor's budget, it could add *new* items of appropriation to the appropriation bills, each of which—not having already been approved by the Governor—would be subject to his line-item veto.

Similarly, if the Legislature thought it prudent to increase funding for an item submitted by the Governor beyond his

---

**4.** The rule the Court adopts today will, of course, apply to all future Governors, male and female. Because the current Governor is a party to these actions, however, I use the masculine pronoun throughout this writing to refer to the Executive.

proposed cap, it would have to wait until the entire statewide budget had been acted upon, and only then could it propose a single-purpose appropriation bill containing the spending increase, which bill would be subject to veto. Of course, in that any such increased spending had to be presented in a single-purpose bill, the veto of such a bill would effectively constitute a line-item veto. Thus, through a combination of realistic oversight, consolidated responsibility and political pressure, executive budgeting promised to produce a more "scientific budget" (*id.* at 387) and reduce the inefficiencies that had led to wild increases in state spending. Although an initial attempt at an Executive Budget Amendment failed in 1915, it was adopted in 1927.

Executive budgeting was not, however, meant to transfer significant lawmaking authority from the Legislature to the Executive. "[T]he separation of powers 'requires that the Legislature make the critical policy decisions, while the executive branch's responsibility is to implement those policies' " (*Saratoga County Chamber of Commerce, Inc. v Pataki*, 100 NY2d 801, 821-822 [2003], quoting *Bourquin v Cuomo*, 85 NY2d 781, 784 [1995]). Rather, the scheme of executive budgeting was aimed at centralizing in one person responsibility for framing out the budget:

> "The executive budget does not deprive the Legislature of any of its prerogatives. . . . It simply makes the Governor who represents the whole State and not a single assembly or senate district, responsible in the first instance for collecting, consolidating, reviewing and revising the estimates of the several departments of government and also for presenting to the Legislature a complete plan of expenditures and revenues—a plan which in his judgment will best meet the needs of the administration of which he is the head. . . .
>
> "The executive budget would not add to the Governor's power over finances" (Report of Reconstruction Commn to Governor Alfred E. Smith on Retrenchment and Reorganization in State Government, at 316-317 [Oct. 10, 1919]).

Executive budgeting was not meant to give the Governor power to require that his fiscal plan be adopted; to deprive the Legislature of its ability to initiate legislation; or to reallocate to the Executive responsibility for legislative—as opposed to budgetary—policymaking:

"Nor is there the slightest force to the claim that the proposed system would give undue power to the Governor. It would add not one iota to the power that he now possesses through the veto of items in the appropriation bills. Whereas now that power is subject to no review and thus may be used as an instrument of reward or punishment after the legislative session is over, the proposed system would deprive him of his veto as to budget items and would thus compel him to use his influence in advance, in the open, under the fire of legislative discussion and the scrutiny of the entire State. It would thus be the Legislature which would have the final word" (Report of Comm on State Finances, Revenues and Expenditures, Relative to a Budget System for the State, State of New York in Convention Doc No. 32, at 21 [Aug. 4, 1915]).

Plainly, the idea behind executive budgeting was simply accountability for state expenditures, missing under the old system:

"[T]he forces of reaction which have opposed this important reform rest their objections on an entirely false foundation. We constantly hear in argument against the executive budget, that it will deprive the direct representatives of the people of a proper control over the purse strings of the State. This argument is not based on fact. The executive budget does not in the slightest degree decrease the power of the Legislature. It provides only for a more responsible method for the exercise of that power. There is nothing new or revolutionary about a proposal placing upon the Executive himself the duty in the first instance of certifying to the Legislature the amount required for the fixed and definite expenses of maintenance of the various departments of the government. There is no reason that I can see why there should not be put upon the Executive the further responsibility of explaining his proposals to the Legislature in detail. There is also no reason why the Legislature should make additions to these sums or indulge in new activities until provision has first been made for the absolutely necessary expenses of government. . . .

"Opposition to the executive budget upon the the-

ory that it lessens the power of the Legislature is nothing but misrepresentation for political purposes. Every proposal for its establishment, so far made, has left the Legislature absolutely free to pass any appropriations it will and to increase or decrease any appropriations it may desire to, after provision has been made for the support of government as comprehended in the bill proposed and supported by the governor" (1925 Ann Message of Governor Alfred E. Smith, at 75-76).

The Court ignores this history when it concludes that executive budgeting effected a transfer to the Governor of lawmaking power over the terms and conditions of spending, such that the Legislature is prohibited from amending the Governor's policy-laden budget bills—which is the practical effect of affirmance here.[5]

## II. The Constitutional Scheme

The Executive Budget Amendment is currently codified in article VII of the New York Constitution—entitled "State Finances." Under the existing system, the Governor—after receiving estimates of the upcoming year's expenses from the various executive departments (*see* NY Const, art VII, § 1)—must annually

"submit to the legislature a budget containing a complete plan of expenditures proposed to be made before the close of the ensuing fiscal year and all moneys and revenues estimated to be available therefor, together with an explanation of the basis of such estimates and recommendations as to proposed legislation, if any, which the governor may

---

5. As this history makes clear, the Governor's role as "constructor" (a 1915 quotation repeated in the opinion at 82, 83, 85, 89) contemplated that he would frame out the budget, not that he would deliver a turnkey project with full programmatic detail.

Contrary to the Court's statement, I do not ignore that executive budgeting modified the separation of powers "to some degree" (opinion at 83), but recognize that "except as restrained by the Constitution, the legislative power is untrammeled and supreme, and . . . a constitutional provision which withdraws from the cognizance of the legislature a particular subject, or which qualifies or regulates the exercise of legislative power in respect to a particular incident of that subject, leaves all other matters and incidents under its control" (*Matter of Thirty-Fourth St. R.R. Co.*, 102 NY 343, 350 [1886]).

deem necessary to provide moneys and revenues sufficient to meet such proposed expenditures. It shall also contain such other recommendations and information as the governor may deem proper and such additional information as may be required by law" (NY Const, art VII, § 2).

By contrast, estimates of the financial needs of the Legislature and the Judiciary must, after being transmitted by those branches to the Governor, be included in his executive budget without revision (*see* NY Const, art VII, § 1). Further, "[a]t the time of submitting the budget to the legislature the governor shall submit a bill or bills containing all the proposed appropriations and reappropriations included in the budget and the proposed legislation, if any, recommended therein" (NY Const, art VII, § 3).

Critical to this appeal, "[t]he legislature may not alter an appropriation bill submitted by the governor except to strike out or reduce items therein, but it may add thereto items of appropriation provided that such additions are stated separately and distinctly from the original items of the bill and refer each to a single object or purpose" (NY Const, art VII, § 4). "Such an appropriation bill shall when passed by both houses be a law immediately without further action by the governor" (*id.*).

By contrast, the Governor retains the right to veto any portions of the legislation that he has *not* previously approved. Thus, appropriations for the Legislature and Judiciary—which must be submitted by the Governor without revision and thus without his prior approval (*see* NY Const, art VII, § 1)—as well as "separate items added to the governor's bills by the legislature," shall be subject to his approval (NY Const, art VII, § 4). Specifically, the Governor is granted the power to veto legislation he disapproves, subject to a two-thirds override by both houses of the Legislature, as well as the power of line-item veto with respect to bills containing several items of appropriation of money.

This constitutional scheme thus comprises a careful system of checks and balances in which the Governor has initial legislative authority over state finances, and in which the Legislature, while it can always make the determination to spend less, is forbidden from spending more *in the Governor's appropriation bills*. Because the Governor has taken on the legislative function in this regard and, by definition, pre-approved of the budget caps contained in legislation he has proposed, he cannot veto

his own appropriation bills once passed by the Legislature. But since he can review and veto all other bills, the Constitution does not restrict the Legislature's untrammeled legislative authority with respect to those bills. It is with respect to this basic premise that I part company with the Court.

My Colleagues—in an endeavor to answer the question of what the Governor may properly include in an appropriation bill—are concerned about the viability of fixing the line between "items of appropriation" and "proposed legislation." I agree that the line is difficult to fix. Given that, the better question may well be not what the Governor can do in an appropriation bill, but what the Legislature can do in response.

The Constitution restricts the Legislature's power to alter the Governor's proposed appropriation bills, but not to alter other proposed legislation. This distinction makes sense because it is only an appropriation bill that becomes law upon passage—without further review by the Governor. All other proposed legislation is subject to the Governor's veto and thus need not be insulated from the Legislature's power to amend in order to ensure that no bill becomes law without the participation of both branches.

The Constitution distinguishes between items of appropriation—properly included in an appropriation bill—and other legislation, which ought to be proposed elsewhere. An appropriation bill as defined by section 4 is a bill "containing all the proposed appropriations and reappropriations included in the budget" within the meaning of section 3. By contrast, a nonappropriation bill contains the other "proposed legislation, if any, recommended" in the executive budget (NY Const, art VII, § 3)—consisting in turn of proposed laws that the Governor "may deem necessary to provide moneys and revenues sufficient to meet [the] proposed expenditures," as well as proposals for legislation implementing "such other recommendations and information as the governor may deem proper" (NY Const, art VII, § 2).

In short, the Governor may propose what he likes, although the Constitution clearly contemplates that those of his proposals that do not constitute items of appropriation of money should go elsewhere than in an appropriation bill. "If the Legislature may not add segregation provisions to a budget [i.e.,

appropriation][6] bill proposed by the Governor without altering the appropriation bill, . . . it would necessarily follow that the Governor ought not to insert such provisions in his bill. He may not insist that the Legislature accept his propositions in regard to segregations without amendment, while denying to it the power to alter them" (*People v Tremaine*, 252 NY 27, 50 [1929] [*Tremaine I*]).

"Items of appropriation" are provisions that "show what money is to be expended, and for what purpose" (*People v Tremaine*, 281 NY 1, 5 [1939] [*Tremaine II*]). Other subjects do not belong in an appropriation bill, as evidenced by the Governor's own submission of "nonappropriation bills" as part of his budget. In general, nonappropriation bills "contain programmatic provisions and commonly include sources, schedules and sub-allocations for funding provided by appropriation bills, along with provisions authorizing the disbursement of certain budgeted funds pursuant to subsequent legislative enactment" (*Silver I*, 96 NY2d at 535 n 1). Put differently, such bills "detail[ ] the utilization of [already] appropriated funds or propose[ ] changes in the operation of certain programs" (*id.* at 535). Further, tax legislation, specifically delineated in article VII, § 2 as the subject of other "proposed legislation," as well as provisions that affect multiple items of appropriation or effect general changes in state law, indisputably belongs in a nonappropriation bill.[7]

Other state courts explaining the distinction between items of appropriation and other provisions—the very issue before us—have reached similar conclusions: "It can be said then that the term 'item of appropriation' contemplates the setting aside or dedicating of funds for a specified purpose. This is to be distinguished from language which qualifies or directs the use of appropriated funds . . ." (*Jessen Assoc., Inc. v Bullock*, 531

---

**6.** In 1929, when the quoted case was decided, the Governor had no authority to propose any budget bill other than one containing all the proposed appropriations and reappropriations included in the budget.

**7.** Agreement that only items of appropriation of money belong in appropriation bills resolves little, however, once it is understood that an "item" is itself a slippery thing. Recognizing that "[t]here is no judicial definition of itemization and no inflexible definition is possible," and that "[t]he specificness or generality of itemization depends upon its function and the context in which it is used," we have held that the proper degree of budgetary itemization is beyond the scope of judicial decisionmaking, and is instead wholly within the province of the Legislature and the Executive (*Saxton v Carey*, 44 NY2d 545, 550 [1978], quoting *Hidley v Rockefeller*, 28 NY2d 439, 444 [1971] [Breitel, J., dissenting]).

SW2d 593, 599 [Tex 1975]). "An item in an appropriation bill is an indivisible sum of money dedicated to a stated purpose. It is something different from a provision or condition" (*Commonwealth v Dodson*, 176 Va 281, 296, 11 SE2d 120, 127 [1940]). Similarly, programmatic provisions that merely affect the allocation of appropriated funds do not constitute items of appropriation, because they do not increase the amount of state expenditures. Such a provision

> "does not set aside money for the payment of any claim and makes no appropriation from the public treasury, nor does it add any additional amount to funds already provided for. Its effect is substantive. Like thousands of other statutes, it directs that a department of government act in a particular manner with regard to certain matters. Although as is common with countless other measures, the direction contained therein will require the expenditure of funds from the treasury, this does not transform a substantive measure to an item of appropriation" (*Harbor v Deukmejian*, 43 Cal 3d 1078, 1089-1090, 742 P2d 1290, 1296 [1987]).

Simply put, "state courts have generally . . . excluded from the definition of appropriation authorizations and other substantive legislation that create spending programs but do not actually appropriate funds" (Richard Briffault, *The Item Veto in State Courts*, 66 Temp L Rev 1171, 1201 [1993]). For an "item of an appropriation bill obviously means an item which in itself is a specific appropriation of money, not some general provision of law which happens to be put into an appropriation bill" (*Bengzon v Secretary of Justice of Philippine Is.*, 299 US 410, 414-415 [1937]).

### III. Distortion of the Constitutional Scheme

My Colleagues conclude not only that the Governor may propose changes to substantive law in connection with his budget, but also that the Legislature is forbidden from altering such proposals by any means—either directly or indirectly. Thus, even those policymaking provisions placed in a nonappropriation bill but relating to a proposed appropriation—effectively, any subject properly included in a *budget* bill—are held unalterable under article VII, § 4, despite its plain language restricting the Legislature only from "alter[ing] an appropriation bill." Indeed, under the Court's rule, the Legislature is effectively

prohibited from amending a nonappropriation bill in any way, since such a bill—by its very nature—cannot contain items of appropriation subject to reduction or striking, but must nevertheless relate to some item in an appropriation bill.

The Governor contends that any programmatic policy conditions he attaches to an appropriation are simply more specific identification of the item for which he appropriates money. If this is so, the Legislature—limited in its authority to alter appropriation bills other than by reducing or striking items—must either accept the conditions imposed by the Governor or refuse to fund the program or service to which it is attached, however essential or desirable. According to the Governor, the Constitution limits him only insofar as the policy proposed must relate to a particular appropriation in the bill and "be limited in its operation" to that appropriation (NY Const, art VII, § 6).

That is virtually no limitation at all.[8] Nearly everything in government requires funding. And since the degree of budgetary itemization is beyond review, the Governor can always broaden the scope of his proposed appropriations to the point where a generally applicable policy condition would "be limited in its operation" to a particular appropriation—as I believe happened here. For example, as conceded at oral argument, the Governor could not, as part of an appropriation for 500 police cars, require in an appropriation bill that every police car in the state have bulletproof glass, but could impose such a requirement attached to an appropriation for police departments. Further, as also conceded, the Governor could under his theory—in order to save money—suspend worker safety laws or the mini-

---

**8.** The Governor misreads the constitutional history of section 6 when he argues that the anti-rider restriction of that section constitutes the sole limitation on his ability to attach substantive or programmatic conditions to an appropriation bill. The provisions now contained in section 6 were adopted in 1894—long before the advent of executive budgeting—in an effort to "prevent many abuses which have obtained in the Legislature, of tacking on to the annual appropriation and supply bill various provisions which otherwise could not be enacted" (2 Revised Rec, 1894 NY Constitutional Convention, at 599). Section 6, whose intent is to "prevent the inclusion of general legislation in an appropriation bill" (*Tremaine I*, 252 NY at 48), thus operates as a constraint on the Legislature's ability to attach as a rider "in any appropriation bill" substantive legislation unrelated to the proposed appropriations—which, if otherwise permitted, would become law immediately upon passage of the appropriation bill containing the legislation, with no opportunity for gubernatorial veto. Section 6 is not, however, the source of affirmative authority for the Governor to attach legislation not consisting of items of appropriation to his appropriation bills, in derogation of section 3.

mum wage at every construction project built using appropriated funds throughout the state. Although the Governor may well not propose such unpopular examples, there are according to his argument few limits to what he *could* propose, and the Legislature would be foreclosed from affecting the proposal except by eliminating the projects altogether.

My Colleagues recognize that this is in theory "troublesome" (opinion at 92) but nonetheless hold that what the Governor sees fit to include in an appropriation bill is properly placed there and incapable of amendment by the Legislature. Although the plurality opines that it may be "possible" to write legislation that does not belong in an appropriation bill (opinion at 93), it gives no guidance as to when such limits will have been reached, noting only that no such transgression occurred here and that, even if one were to occur in the future, the courts might in any event be precluded from resolving the political question thereby presented (*see id.* at 97).

But I cannot, for example, agree that the Governor may, in the course of proposing his annual appropriations for public schools, include in his bill—as he did for the first time in 2001—17 pages of substantive revisions to Education Law § 3602, which in turn contains the legislatively enacted formula by which funds are allocated to school districts across the state, or that he can thereby present the Legislature with the take-it-or-leave-it choice of either accepting his substantive proposals in their entirety, or simply refusing to fund the public schools. This detailed proposal significantly "stray[ed] from the familiar line-item format" (one of the criteria identified in the concurring opinion at 102).

I agree that "[t]here could be no objection on constitutional grounds if the bill, instead of reciting the formula, named every school district in the state and specified the sum that would go to each—in other words, if the authors of the bill had applied the formula themselves and written the result into proposed legislation" (opinion at 98). But what my Colleagues fail to recognize is that, in doing so, the Governor would be required to apply the formula codified in Education Law § 3602 (McKinney's Cons Laws of NY, Book 16, Education Law § 3602, 2004 Pocket Part, at 3-94)—for that is the duly enacted and binding law of the State. Because allocation according to the existing formula is thus mandatory unless Education Law § 3602 is rewritten or notwithstood, the Governor could not apply a *different* formula were he to calculate and propose itemized ap-

propriations for each district.[9] As the Court additionally recognizes, it has been the "history and custom of the budgetary process" (see concurring opinion at 101)—until 2001—not to include the policy choices codified in Education Law § 3602 in gubernatorial appropriation bills (see opinion at 86-87).

Because choices pertaining to the statewide allocation of resources among school districts involve policy determinations concerning the relative importance of, for example, special education; gifted and talented programs; employment preparation; summer school programs; success at class-size reduction; and support services for troubled and disabled children, these choices have until 2001 been understood as fundamentally legislative. Indeed, school funding has been among the most intensely negotiated issues (see e.g. H. Carl McCall, *An Agenda for Equitable and Cost-Effective School Finance Reform*, at 31 [Oct. 1996] ["School aid is most often one of the last issues to be resolved in the budget negotiations"]; *Too Far on Bargaining*, Rochester Democrat and Chronicle, Dec. 23, 2002, at 8A ["New York's governor . . . and state lawmakers traditionally prefer to glide through the legislative session without taking up the explosive and nearly intractable problem of public-school funding and the formula that supposedly drives the money train"]).[10]

Nor can I agree with the Court's conclusion regarding the Governor's 2001 appropriation for the State Museum and State Library, which proposed moving the Museum and Library from the Department of Education to a nonexistent "Office of Cultural Resources"—effectively modifying existing Education Law §§ 232 and 202, which provide that the State Museum and Library are departments of the University of the State of New York, in turn governed by the Board of Regents. Twenty-two of the Legislature's 37 single-purpose appropriation bills were

---

**9.** That a duly enacted statute may suspend, rather than repeal for all time, the operation of existing law (see opinion at 98-99) is irrelevant. The critical fact remains that even a temporary abrogation of general legislation reflects a legislative judgment to be made by the Legislature. Here, the Governor's proposal had an "effect on substantive law" (one of the criteria identified in the concurring opinion at 101), "actively alter[ing] . . . the State's statutes" (id. at 102).

**10.** Other examples of changes to substantive law proposed by the Governor in his 2001 appropriation bills include amendments to Public Health Law § 2808, governing the computation of Medicaid rates for residential health care facilities; and a proposal reauthorizing lapsed Social Services Law § 153-i, which provided for state reimbursement to social services districts for family and children's services.

enacted to restore oversight and control of the State Museum and Library to the Education Department.

As we have recently made clear, the "choice of *which* agency shall regulate an activity can be as fundamental a policy decision as choosing the substance of those regulations" (*Saratoga*, 100 NY2d at 823 [emphasis in original]). The Governor contends that, because he proposed an appropriation of money for the State Museum and Library, conditioned on their transfer to the new agency as proposed in his nonappropriation bill, the Legislature was limited to either accepting his conditions, or defunding the Museum and Library altogether.

My Colleagues deny any significance to the Governor's inclusion in his appropriation bill of proposed funds for the operation of these institutions within the new agency on the ground that the Governor's assumption that legislation creating the agency would be passed "proved ill-founded" (opinion at 99). If by this they mean that the Legislature remained free—as in my view it did—to appropriate money for the State Museum and Library but within the Education Department, I certainly agree. But I cannot reconcile this conclusion with the reasoning underlying the remainder of the writing. For if the Legislature is foreclosed from enacting single-purpose appropriations for a purpose similar to a gubernatorial proposal—particularly a proposal that has been stricken or rejected—as well as from amending the Governor's appropriations indirectly or adopting conditions different from those he has proposed, how could the Legislature—having rejected the programmatic conditions attached to the appropriation in the nonappropriation bill—reauthorize the Museum and Library?

The Governor's claim that the intent of the Executive Budget Amendment was to grant him authority to change the substantive laws of the State is unsupportable.

In 1927, after the dangers of legislative budgeting had been identified and debated, the Governor was for the first time given the power to propose legislation directly—but only in appropriation bills. To be sure, the Governor could *recommend* other legislation in his executive budget, but the power to actually introduce bills obliging action into both houses of the Legislature—a power he has in no other context than the budget—was limited to appropriation bills. Only in 1938 was the predecessor to section 3 amended to give the Governor the additional authority to introduce other "proposed legislation" recommended in

his executive budget. This amendment was adopted primarily to make the Governor responsible for submitting tax legislation, rather than merely recommending it. "Believing that the revenue side of the budget is of equal importance with the expenditure side, the committee feels that any bills to carry into effect legislation affecting the revenues of the State which the Governor may propose should have the same dignity and importance as his appropriation bills, and all should be submitted directly by the Governor and treated as budget bills" (Report of Comm on State Finances and Revenues of New York State Constitutional Convention, State of New York Constitutional Convention 1938 Doc No. 3, at 3 [July 8, 1938]).

Thus, my Colleagues' conclusion that the 1915 and 1927 framers of executive budgeting intended to grant the Governor broad power to make legislative policy beyond mere fiscal policy, or to propose—and prevent alteration of—changes to the Consolidated Laws of the state, is unfounded and inconsistent with the constitutional budgeting scheme adopted by the framers.

Under the Constitution, the Legislature is entitled to respond to the Governor's policy proposals in any of three ways. First, as we explained in *Tremaine I*, a condition placed on the expenditure of funds is itself "an item or particular, distinct from the other items of the bill, although not an item of appropriation" (252 NY at 50). As such, it is subject to striking in an appropriation bill under section 4.[11]

Second, the Legislature may amend a nonappropriation bill, either by altering policy conditions proposed in the Governor's appropriation bill, or by proposing new conditions altogether.[12] Contrary to the conclusion of my Colleagues (*see* opinion at 89-90),

---

**11.** The Legislature may not, however, strike the Governor's itemized appropriations and replace them with a lump sum, for "[w]hen . . . we are told that the Legislature may not alter an appropriation bill submitted by the Governor, except to strike out or reduce items therein, we expect the appropriation bill to contain items" (*Tremaine II*, 281 NY at 5). Nor is *Tremaine II* applicable to single-purpose appropriation bills under article VII, § 6 (*see* opinion at 91-92). That case construed the Legislature's authority to add items to a Governor's appropriation bill under article VII, § 4.

**12.** Of course, the Legislature's amendments may not propose new or additional expenditures of money, for such a proposal would by definition convert the nonappropriation bill into an appropriation bill—one containing appropriations of money. Rather, any such proposals must be made in single-purpose appropriation bills considered after the Governor's appropriation bills have been finally acted upon (unless the Governor certifies the necessity of immediate passage) (*see* NY Const, art VII, § 5). Enacting a wholly new item of appropriation is distinct from amending substantive conditions placed on the expendi-

nothing in section 4 "prevents the Legislature from itemizing appropriations or from enacting general laws, apart from the Governor's budget [i.e., appropriation] bill, providing how lump sum items of appropriation shall be segregated, subject to the veto power of the Governor" (*Tremaine I*, 252 NY at 49). The Legislature always "can accomplish its objective to restrict or allocate the expenditure of appropriated funds by enacting separate bills" (1982 Ops Atty Gen No. 82-F5, at 22). Nor does *New York State Bankers Assn., Inc. v Wetzler* (81 NY2d 98 [1993]) hold otherwise (*see* opinion at 91). There we held only that the Legislature could not alter an *appropriation* bill other than as restricted by section 4, even with the consent of the Governor. *Bankers* imposes no limitation on legislative amendment of *non*-appropriation bills.

Third, while the Legislature may not increase the dollars proposed in a gubernatorial appropriation bill, the Legislature may later—after the comprehensive budget submitted by the Governor has first been addressed—pass a single-purpose appropriation bill that proposes to spend the same amount of money, or more, with new, different, or no conditions. Of course, both branches may well agree, as the fiscal year progresses, that additional funds are needed. Such funds must be proposed by the Legislature, because the Executive has no constitutional power to introduce appropriation bills after the budget cycle. But if the Governor disapproves of the additional spending, or of the conditions, he may veto the bill.

With each of these options forbidden, however, the Legislature will be effectively precluded from proposing or influencing policies affecting state-funded programs for which the Governor has proposed an appropriation. To cite one example, if the Governor proposed money for housing the homeless, the Legislature could neither specify which shelters should receive the funding, nor pass legislation requiring that state-funded shelters apply specific criteria, nor direct that certain programs be offered within the shelters. Or if the Governor proposed funding for prisons, the Legislature could not direct that surveil-

---

ture of appropriated funds directed to a specified recipient. Thus, my Colleagues are quite correct that the 1929 Legislature could have passed a single-purpose appropriation bill—subject to the Governor's veto—for "any other purpose the Legislature liked" (opinion at 94). Plainly, if the Legislature wanted to pass this appropriation *instead of* Governor Roosevelt's wholly unrelated proposal, it would strike his appropriation. If, on the other hand, it wished to pass the new item *in addition to* the Governor's item, it would pass both.

lance cameras be installed, or that additional security measures be taken. Or if the Governor proposed an appropriation for police departments, the Legislature could not direct that police officers undergo counterterrorism training.[13] In effect, the Legislature loses its ability to legislate in any area directly or indirectly relating to an appropriation. That is a distortion of the constitutional scheme of executive budgeting.

## IV. The Line-Item Veto

In *Silver I*, we held that the question whether the Governor was empowered to exercise a line-item veto against substantive amendments enacted in nonappropriation bills in 1998 was justiciable, and returned the case to the lower courts for a decision on the merits. Today, the Court declines to decide the question, reasoning that because the Legislature acted unconstitutionally in amending the Governor's nonappropriation bills, the question whether the Governor acted constitutionally in line-item vetoing those amendments is academic.

*Silver v Pataki* is a declaratory judgment action brought by the Speaker of the Assembly and the Senate challenging the Governor's action. As an affirmative defense, the Governor argues that the Legislature's actions in amending his bills were unconstitutional, thus permitting him to exercise his line-item veto. Even if the Constitution precluded the Legislature from altering nonappropriation bills—which it does not—this circumstance would not relieve the Court of its responsibility to decide the question presented. For the Governor can prevail in his affirmative defense only if he establishes two elements: that the Legislature acted unconstitutionally, and that the Constitution permits him to exercise a line-item veto to strike unconstitutionally enacted provisions. The Court ignores the second element.

As a legislative power, the veto is an exception to the separation of powers and in derogation of the general plan of state government. It may therefore be exercised only when autho-

---

**13.** While denying this, the opinion notes that even when the Governor proposes an appropriation for prisons with substantive conditions attached, the Legislature "remains free to legislate on such subjects as the way in which prisons should be operated" (opinion at 92). I certainly agree, but I cannot reconcile this statement with the conclusion that in 1998 the Legislature violated the Constitution by requiring that the Franklin County prison proposed by the Governor contain a separate building suitable for educational, vocational, recreational and other inmate activities (*see* opinion at 86).

rized by the Constitution, and the language conferring it must be strictly construed. Indeed, New York's constitutional history reflects a determination not to give the Governor the greater power to veto "parts," "sections," "portions" or "provisions" of any bill, because this would result "in making the Governor the affirmative and sole law-making power of the State, instead of being the negative" (2 Proceedings and Debates, 1867 NY Constitutional Convention, at 1112 [Delegate Folger]; *accord id.* at 1117 [Delegate Church] ["it will make the Governor a part of the affirmative legislative power of the State"]).

> "If any bill presented to the governor contain several items of appropriation of money, the governor may object to one or more of such items while approving of the other portion of the bill. In such case the governor shall append to the bill, at the time of signing it, a statement of the items to which he or she objects; and the appropriation so objected to shall not take effect. . . . All the provisions of this section [governing procedures for reconsideration by the Legislature of gubernatorial vetoes], in relation to bills not approved by the governor, shall apply in cases in which he or she shall withhold approval from any item or items contained in a bill appropriating money" (NY Const, art IV, § 7).

Thus, the Constitution authorizes the use of the line-item veto only to strike items from appropriation bills—that is, bills containing several items of appropriation of money—as a check on government *spending*. There is simply no authority for exercise of the line-item veto against provisions contained in nonappropriation bills, as occurred in 1998. Nor can the Governor strike related provisions without striking the item of appropriation itself, for the Constitution is clear that it is "the appropriation" that shall not take effect upon exercise of a line-item veto.

Further, the Governor may not exercise a line-item veto in a manner that would otherwise have been impermissible simply because he believes that the provisions he strikes are unconstitutional. The Constitution recognizes no such exception. The separation of powers, moreover, does not permit the Executive to assume the judicial function of reviewing the constitutionality of laws passed by the Legislature and then acting to void them beyond his explicitly conferred power of general veto.

*Tremaine I* does not say otherwise. There, after determining that certain provisions attached to an appropriation bill by the

Legislature were unconstitutional, we explained that "[s]o far as the appropriations themselves are concerned, they may be separated from the unconstitutional parts of the statutes and are, therefore, the law of the State. . . . The Legislature may not attach void conditions to an appropriation bill. If it attempts to do so, the attempt and not the appropriation fails" (252 NY at 45). The Governor, however, misreads our severability analysis—essential to formulating the scope of our corrective action after judicial review—as authorizing the Executive himself to effectively sever purportedly unconstitutional portions of statutes from the remainder, *without* any judicial review. The Constitution grants him no such authority.

Since the courts below agreed that the provisions he struck were indeed unconstitutional—and voided the very provisions he had purported to strike—his vetoes, and therefore his *ability* to veto, were given full effect. Thus, if the Governor line-item vetoes an unconstitutional provision in a nonappropriation bill, his endeavor to render the provision void (by veto) will succeed if challenged on appeal, thereby effectively upholding the Governor's authority to veto unconstitutional provisions in non-appropriation bills—the very question that the Court declines to answer.

## V. Conclusion

The executive budgeting scheme set forth in our Constitution is not the system my Colleagues sanction today. For 70 years no Executive has exercised the legislative power the Court, by its affirmance, now recognizes as a template for the future. The Court rejoins that the Legislature is not deprived of its ultimate authority because it retains the option to reject a Governor's appropriations in their entirety and cease to fund essential services of government. That the system permits stalemate is unconvincing proof that it requires it.

Judges GRAFFEO and READ concur with Judge R.S. SMITH; Judge ROSENBLATT concurs in result in a separate opinion in which Judge G.B. SMITH concurs; Chief Judge KAYE dissents in another opinion in which Judge CIPARICK concurs.

In each case: Order affirmed, without costs.